It looks like everybody is ready. Let's call the next case, 23-1049, Flores v. Henderson, and Ms. Hucknall, you're to proceed. Hucknall Good morning, Your Honors. My name is Heidi Hucknall. I'm here today on behalf of appellants. This case is the one involving the 9-1-1 hostage call resulting in an officer-involved shooting. On March 4, 2019, following a 9-1-1 call where the officer, where the caller reported that he had killed people and that he was holding hostages who he suggested would be killed within 10 minutes, officers on scene got conflicting information. On the one hand, they were told that that this call was an alert-toned call. It was the highest priority. It was a call suggesting that lives were in danger. It was a call that suggested that it was an in-progress call and that innocent lives were in the balance. And on the other hand, the officers were told by at least one witness on the scene that the suspect might have mental health issues, that he was unarmed, and that he was alone, after having initially told officers that she didn't know if anyone else was inside or hurt. In the face of this emergency, after seeing a door ajar, after giving loud and clear commands, after announcing themselves as being police officers, after hearing a voice from inside telling the officers that they would have to come in and get him, officers made a judgment call to go inside the apartment to protect innocent life. Officers could not and did not know that by going inside to sweep the apartment that they would have to use lethal force. Officers did not unconstitutionally escalate the situation because of their reckless or deliberate behavior. Officers have been called to investigate a homicide where they understood that additional lives were in imminent peril. If this were truly a hostage situation, does the record reflect any sort of policy or protocol for situations like this for responding officers? Your Honor, if it was purely a hostage situation... In other words, negotiate, retreat, set up a perimeter, there's a variety of scenarios I can imagine. But does Aurora have a policy? Certainly, Your Honor. Aurora does have a hostage policy for purely hostage situations, but this one was one where individuals were indicated to have been killed, other individuals were indicated to be being held, and time was also critical. What is the hostage policy? Generally, Your Honor, the hostage policy would be that you would call in other individuals to help assist. If it was purely a hostage situation where lives were in imminent peril, here lives were in imminent peril, so the officers were going to go into the house. If it was one where, hypothetically, somebody called and said, I'm holding somebody and you better get here, as opposed to I'm holding somebody and in 10 minutes I'm going to be killing these people, those officers are trained to go in. They're trained to go into that type of situation immediately. As we've seen recently with the Uvalde shooting and other officer-involved shootings, where somebody's actively shooting an active scene, officers are trained to go in. So that's why they had four officers there, Your Honor. They established a plan where there was lethal force first, less lethal force second. Didn't they develop information during the sweep that might have reasonably suggested that there was not a hostage and that the suspect was in the bedroom by himself? Your Honor, first of all, there was information aired by one of the officers during the time of the sweep. It's not clear that any of the officers heard that information. It's not heard on their body-worn cameras. They don't acknowledge that information as they're going down the hall. One officer who was in a room by himself doing a sweep in the first room, you can hear it on his body-worn cameras. You can't hear it on the rest. Why is that? We don't know, Your Honor. Maybe they had their radios turned down, they were going down the hallway. But in any event, Your Honor, they also had conflicting information. They had information from the same witness who said that she didn't know if anyone else was inside or hurt inside. That's what she originally said. The officers also had this press, Your Honor, of the worry that there were people in that room, whether it was one or multiple people, people who had been killed, people who may have been dying, people who might be killed. So the officers weighing those countervailing considerations were going to go through and make sure that nobody was in there. Now, there are a lot of pieces of conflicting evidence, but because this is on sobering judgment, don't we have to view the evidences in the light most favorable to the non-movement, to the plaintiff? The video shows that there is not a peep when Officer Henderson and the two officers line up behind him in the corridor. The sister says that she doesn't know of anybody in the room with him. She doesn't know, she doesn't think that there is a weapon. And so when you view the evidence in the light most favorably to the plaintiff, what distinguishes this case from the state of Sevios, which interpreted Allen as early as 2013? Because it seems to me that the state of Sevios and Allen are almost identical in the fact that there is someone who could be dangerous, like the young man in the car in Allen, and Officer Henderson, rather than wait, rather than do anything, you can see him kick the door in. And so he says that the guy came out with a machete almost exactly like the young man points the gun at one of the officers in Allen. So how is this different than Allen with regard to Officer Henderson? Your Honor, these cases are different than Allen, specifically in Sevios, as you mentioned. Because first of all, well first, Sevios was decided after this case. But interpreting Allen is clearly established in 2013. Yes, Your Honor. It did rely on Allen, which we recognize as precedent for this circuit. We recognize also that other circuits, there's a split in circuits and that different circuits have gone different ways. But anyway, Your Honor, to get to your point, in Allen and in Sevios, these were calls where individuals had indicated that they were threatening suicide. They were known to be armed. They were known to have nobody else at risk. There was no worry that there was anybody else within their perimeter or their ambit. Now, Sevios, there is the argument that you raised, Your Honor, in your dissent, that perhaps he was further away and he could have skirted out of view. And that therefore, you found that there wasn't clearly established law in that case, relying on Allen. But in any event, in Allen and in Hastings and in Sevio, those cases are clearly demarcated from this case. Because the officers knew that the people were in crises. They pushed them. They provoked them. They incited them. They knew that they were armed. In Allen, they saw him holding a gun in his hand. In Hastings, they chased him through the house, pepper spraying him into a room, knowing nobody else was in the room. And Sevio, the father called to say his son was suicidal and they needed help. And when they went to the room, seeing he was alone in that room, the officers approached him in rapid speed. So that is how this case filters out a little differently, actually significantly differently, than Allen or Sevios or Hastings or Sevio. The fact that these officers did not know what was in that room is a critical fact here. The fact that these officers did not know that he was armed is a critical fact here. The fact that the officers, given these countervailing issues, were going to make sure that nobody was in there. They were going to err on the side to make sure nobody was in that room, behind a closed door, after giving repeated orders to come out. After even calling him by his name and asking him to come out. And after giving him time to come out of that room. So I think that's what distinguishes these cases, Your Honor. Is there any dispute between the parties about the machete evidence? No, Your Honor. In fact, the plaintiffs, as I understand their argument, don't dispute the entry into the house, into the apartment, excuse me. And they don't dispute the fact that when the force was used, it had to be used. He came out with a machete over his head. The machete is a machete. It's not a pocket knife. And additionally, he was charging at the officers who were attempting to retreat, who were attempting to give commands, even as he was coming after them. He was literally on top of them. So I don't think that there's any issue at all as to the machete and the threat that it presented, the imminent threat to those officers at the time that they used the force that they used. But the district court didn't mention the machete. Yes, which is one of the problems, Your Honor. Well, that may be a problem. But for purposes of Lewis versus Tripp, on interlocutory review of the denial of qualified immunity, aren't we bound, limited, by the facts that the district court found that a reasonable jury could find? Well, Your Honor. So how can we consider the machete? You can consider, first of all, the district court relied, as Your Honors know, on the unverified complaints, the allegations in the complaint that did not bear out in the discovery of the case. The district court relied exclusively on the allegations in the complaint, which we would submit allows you to have a de novo review based on that fact alone. In addition, there is body-worn camera evidence. There's evidence from the 911 call. There's evidence from the CAD notes. There's also evidence from the radio traffic and the record before the court that shows that the district court's findings are blatantly contradicted by the record. When I watch the video, though, I don't see the machete. Your Honor, the machete is seen when Mr. Jackson is deceased and laying on the ground and, unfortunately, has passed or is being worked on or they're giving life supporting aid. That machete is seen on the ground there. I don't think there's any dispute that Mr. Jackson came out with a machete. All of the deposition testimony that's in the record before the court as well is uncontroverted that he came out with the machete overhead. And that machete is seen on the floor next to him after the shooting occurs. So given those facts, Your Honors, we believe that this case is distinguishable from the clearly established, the progeny of Allen and the holding in bond that specifically said that you can't define the law at such a high level of generality. And we're asking this court to reverse the district court, given the record before the court, and even if this court were to consider the facts as found by the district court, we still believe that the information in the record is blatantly contradicted by the district court's findings as well. And I'd like to reserve the rest of my time for rebuttal. Thank you. I just ask you, you made reference to clearly established. Are you relying on step two, qualified immunity analysis, for your argument? We're relying on both, Your Honor. We're saying that there wasn't a constitutional violation under Graham and Larson, considering those factors. And in any event, the law wasn't clearly established, given the facts of this case. So we're relying on both, Your Honor. Thank you. Thank you, counsel. Good morning. May it please the court. My name is Kylie Schmidt. I'm here on behalf of Apple East today. Plaintiffs below here have two requests. First, that this court dismiss this appeal for lack of subject matter jurisdiction. And second, in the alternative, that this court remand this case after affirming the summary judgment order below. Let's first talk about the lack of subject matter jurisdiction and the limited interlocutory appeal that this court has in reviewing these facts. This court can't second guess the facts. And as appellants identified, this case is replete with disputed facts left and right. We've seen disputed facts during this time frame from the call from dispatch all the way to that use of force in the hallway of this man's apartment. And these disputed facts are the heart of this case and why it screams for a jury to hear this case rather than a court or a judge. And the court below appropriately addressed the standard in summary judgment, looking at the facts in the light most favorable to the plaintiff. And when looking at those facts in light most favorable to the plaintiff, here's how things went down. There was a call, Aurora Police, dispatch, confusing, right? They're not sure what's going on here. They think it's a prank. There's evidence supporting that it's a prank or swatting, right? A call to elicit police report, a large police response. And that information and those facts down below demonstrating that this potentially was a prank was determined by the court below. And the lens of... Well, the court didn't determine it was a prank. Correct. I'll give you that, Your Honor. Let me just ask you, in terms of your jurisdictional argument, what would you identify as the key facts that the appellants are contesting now on appeal? Sure. Are they really disputing anything that the district court found? They absolutely are. And what would those be? The fact that this call was urgent and high priority. We have disputed evidence demonstrating that it was a swatting call or a prank call. Well, you just said, though, that the court didn't conclude that it was a prank call. It was more a matter of it could have been and there was confusion. Isn't that really the factual finding is that there were conflicting messages provided to the responding officers? Conflicting messages, yes. But I submit that those conflicts of what information the police have in this period before the use of force was disputed facts. And in this period before the use of force, which this circuit must consider when addressing this time frame, those disputes leading up to it show that this court doesn't have subject matters jurisdiction. And to go to some of the additional facts that are being, pardon me. Is there a fact dispute that the suspect came out of his bedroom with the machete raised? Is that undisputed? As Judge Bacharach said earlier, review of this body cam footage, it's hard to tell whether there was a machete in the man's arms. I think it's undisputed that there was a machete on the scene. On page six of your brief, in your listing of the facts, it says at 9.01, 15 seconds a.m., Mr. Jackson comes out of his bedroom holding a machete. Are you backing off from that now? Holding a machete, yes. How he wielded it, in which arm he had it, that's where the dispute lies. And to look at this too, the concept of hindsight, right? It's this on-the-scene perspective. And the Supreme Court in Saussure has said that the use of this 2020 vision of hindsight is not permitted. And to get back to Judge Matheson, your question about which facts are disputed, we have a disputed fact about whether the suspect was armed or not in the room. And because we're required to look at that time frame before the use of force, it was disputed as to whether or not he was armed. We can't now, in hindsight, go back and say, well, we know now that he was armed because he came out holding a machete. Well, he told dispatch he was armed in the 911 call, right? It is in the record that he called dispatch and said that there was a machete. And that he killed two people. I don't believe that the record supports that he killed people, like appellants suggest. I instead think that the record supports that there was a report of people dead and people being held hostage, not that people were killed. Okay. And I believe that's supported in the transcript of this 911 call. And really, the purpose of my question, at the time the shots were fired, that really is kind of a fog of war situation. It seems to me that the strength of your case is a fact dispute. It was whether the officers incited, created the crisis for the use of force. For me, the facts in this case are, could a reasonable jury find that they provoked the use of force here? Yes, certainly. And in looking at the pre-use of force time frame, there's evidence to support that this man was unarmed. He was alone. He was alone in his own home. And there were suspected mental health issues. And to loop back to something that was said earlier, there was some discussion about the Aurora Police's hostage policy. And that is in the record. It was Exhibit 78-8, or Docket Number 78-8. And in that hostage policy, it talks about stalling, it talks about negotiation, and it talks about how good judgment demands a tactical plan rather than rushing a barricaded suspect. And these are the items that this jury would be able to hear in determining whether or not that conduct that precipitated the use of force, whether there was deliberate conduct before that seizure that provoked the suspect's actions. And the court in Pauley adopted that. And as we discussed in the briefing, this court has reaffirmed that the pre-force circumstances are critical in assessing whether or not the force use in a circumstance was reasonable. And it not only depends on danger at that precise moment, but whether the police's own reckless conduct or deliberate conduct created that scenario. And we have that here. What would you, if you were describing to the jury, what was the recklessness of the officers on the scene? I guess in particular, Mr. Henderson, Officer Henderson. Sure. I think viewing it through this lens of this really, really short time frame is critical. They arrive on the scene, and in about a two-minute time frame from entering into this apartment, shots are fired that kill Mr. Michael Jackson. And Henderson in particular is, based on the evidence below, they walk in and they realize there's no dead bodies in this apartment. There's no one crying out for help. There's nothing strange about this situation that would support that it's a hostage situation. And you have four officers in this apartment, staffed three deep in a narrow hallway, one with gun drawn, one with tasers drawn, yelling at— I thought Orchard had stayed at the doorway with his sister. Am I wrong about that? No. Officer Johnson, who was the female police officer, took Miss Jackson, Mr. Jackson's sister, up a few stairs to a landing in the apartment where she was talking to her and obtaining information, simultaneous with these other officers entering and clearing the apartment and rushing this man into where he was barricaded in his bedroom. And de-escalation. Let's talk about that. Well, okay. You go ahead and talk about it. Sure. I don't mean to interrupt. Again, this hostage policy talks about these concepts of stalling and negotiation, how you may need to de-escalate the situation, and gathering information. That's what I wanted to ask you about. Sure. In terms of—it's one thing against the city of Aurora. With Vernon Matthews' hand in an orchard, who were lined up behind Henderson, now you argue that they didn't de-escalate, they didn't defuse. But unlike the situation with Henderson, you haven't identified any precedent, either from the Tenth Circuit or the Supreme Court, that says that there's a constitutional obligation for an officer who is in a position to intervene to contribute by defusing the situation or something like that. What precedent should we rely on for Matthews' hand in an orchard? Right. And the precedent for the officers that did not wield the weapon that resulted in the deadly shots, that's a failure to intervene theory. And that duty to intervene— Well, but they—I mean, you know this, but you look at the corridor. As you pointed out, they are two, three, and four behind Henderson. It's Henderson who kicks the door in and that accelerates the confrontation. How can Matthews' hand in an orchard, who are behind Henderson, how would they even know that he's going to kick the door in? That's the whole—I thought that's the might of your argument to the jury, is that Henderson precipitously created the danger by kicking the door in. But the only thing that they can see, the other three officers, is Henderson's back. Well, there is verbal discussion that happens during this in the hallway. And to set the scene, even shortly before this stack in the hallway, Officer Johnson, who's with Ms. Jackson, is reporting things over the radio. And it is a disputed fact whether or not the other officers heard, unlike the appellant's claim. So this information is being exchanged. They're stacked in the hallway, and there's this discussion that occurs, and it's, hey, the door's open. And then he kicks it, and then someone says, announce again. And so they are together discussing and deciding how to proceed towards the suspect based upon this communication. After he kicks the door in? Yes. After he kicks the door in, you can see on the video, he immediately shoots. I'm talking about the first kick of the door. There's an initial kick of the door where it opens and closes quickly. And then there's the second kick of the door where the suspect comes out. So there is time built in, in that time frame, where there's this discussion amongst everyone, and they're talking about what to do. And in the footage, you also see Officer Hannon squeeze the shoulder of Officer Henderson to tell him to, in effect, move forward. And the post-incident interviews talks about how that squeeze of the shoulder indicated to him that he should proceed and approach the suspect. So there is verbal and nonverbal communication amongst and between these officers that demonstrates that, no, it wasn't Officer Henderson acting alone. It was him collectively with the other officers jointly approaching this barricaded person in his home. Thank you. I'd like to last address one other thing raised by the appellants, and that's the Larson factors. As this Court's aware, the Larson factors were raised for the first time in the reply brief filed by the appellants. Down below, Larson was cited, but the factors within Larson were not delineated or argued or considered by the Court. Larson is merely a tool, and I think the most critical piece here is that in Larson, there was not a claim that the officer's conduct caused the need for deadly force, and that's distinguishable. And, again, appellees urge this Court to either dismiss for lack of subject matter jurisdiction or affirm the order below. Thank you, Counsel. Just to elucidate a couple of points raised by appellees. First, as to whether or not it was a prank call, it's clear from the cert interview that's in the record that Officer Orchard clearly says in his cert interview that at first he thought it was such a call, but when he got on scene, saw the door was ajar, heard somebody from inside say, you're going to have to come in and get me, his mind switched, and he said, this is real, this is happening now, and we're going in. That is what he said in the cert interview. So the fact that just the one portion of his statement was included in the cert interview shows the incompleted, the problem with the fact that they didn't include the entire portion of Officer Orchard's interview. Additionally, Your Honor, in Arnold versus Olathe, in that case, obviously, this court, Your Honor, found, Chief Judge Timpukavich, that time is only one factor. And in those cases, in Allen and in Hastings and in Sevier, where there was a short, compressed time, they weren't dealing with somebody who they thought was going to kill other people. They weren't dealing with somebody who they believed was going to injure anybody else. It was clear that that person was alone, was threatening suicide, and was armed. And those are not the facts that we have here. And in order to establish, clearly establish law, it has to be that every reasonable officer would have understood that what he was doing violated existing precedent. It must have placed the constitutional debate, constitutional question beyond debate. We don't have that here with this case. In fact, these facts are very different than the facts that the district court relied on, in terms of the volatile nature of the conduct, in terms of the fact that they were at an unfolding event on the scene that shouldn't be reviewed in 20-20 hindsight. Additionally, clearly established, I'm sorry, additionally, conflicting facts in the record are not the same as legally disputed facts preventing summary judgment. So even if you were to take the facts as the court had them, excuse me, I'm running out of time. May I just finish? Go ahead and finish your thought. Thank you, Your Honor. Even if you were to take the facts as the district court found them, there is not clearly established law in this circumstance. And there was not a violation of constitutional law in terms of these officers recklessly, deliberately, intentionally provoking Mr. Jackson from coming out behind the closed door with the machete overhead. Thank you. Thank you, Counsel. Counselor excused. Appreciate the arguments this morning, and the case shall be submitted.